# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01190-COA

**ROBERT E. COLLINS A/K/A ROBERT COLLINS, JR.**　　　　　　　　　　**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**　　　　　　　　　　　　　　　　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/10/2019 |
| TRIAL JUDGE: | HON. DAVID H. STRONG JR. |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | DEE BATES |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/10/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. Following a jury trial, Robert Collins was convicted of conspiracy to commit armed robbery and armed robbery. On appeal, Collins argues that the jury instruction setting out the elements of armed robbery constructively amended his indictment. However, Collins did not object to the instruction at trial, so the issue is waived in the absence of "plain error." We conclude that the instruction did not prejudice Collins's defense or the outcome of the trial or result in a manifest miscarriage of justice. Therefore, the instruction was not "plain error," and Collins's convictions and sentences must be affirmed.

**FACTS AND PROCEDURAL HISTORY**

¶2.     On August 31, 2017, Linda Frazier was employed as the branch supervisor of the Eastside branch of State Bank and Trust in Brookhaven. Frazier entered the bank around 8:10 a.m. She locked the door behind her and checked inside before signaling to another employee, Brandi Green, that it was safe to enter. Green saw Frazier give her the "all clear" and started toward the employees' entrance. As she started to open the door, a man suddenly appeared and pushed her inside the bank. The man was wearing a black and blue mask, gloves, black pants, and a maroon sweatshirt with the words "Work Safe" written on the back. Another masked man followed them inside. Both men had guns and were pointing them at Frazier and Green.

¶3.     The man in the maroon sweatshirt stated, "Calm down. Everybody calm down. We don't want to hurt you. No one has to die. We just want the money." Frazier opened the vault and began removing money from it. The men had not brought anything to carry the money, so Frazier put the money in a plastic garbage bag for them. The men took all of the money in the vault—$165,000—and then ran out of the bank in different directions. The man in the maroon sweatshirt was carrying the money. Frazier and Green both testified that they feared for their lives during the ordeal.

¶4.     Detective Jonathan Alford of the Brookhaven Police Department responded to a call about the robbery. As Alford walked around the bank, he noticed a handgun on the ground on the other side of a chain-link fence behind the bank. When Alford retrieved the gun, he noticed a plastic garbage bag hanging in a tree and a large amount of money on the ground.

2

More money was scattered nearby. Alford followed a "money trail" through a wooded area and eventually recovered all $165,000 that had been taken from the bank. While Alford was collecting the money, he learned that a suspect, Robert Collins, had been apprehended.

¶5.     Alford later interviewed Collins. Collins told Alford that he and his accomplice had waited in the woods behind the bank until they saw Frazier and Green enter the building. Then they rushed the women and robbed the bank. After they had emptied the vault, Collins and his accomplice ran through the woods. They were supposed to meet a getaway car, but the car left without Collins.

¶6.     Collins was apprehended in a wooded area near the bank at the end of the "money trail." A large sum of money, the "Work Safe" sweatshirt, a T-shirt, and other pieces of black clothing were found on the ground near Collins. DNA from the T-shirt was a match for Collins's DNA profile. The probability of finding the same DNA in another individual was one in more than ten billion.

¶7.     After he was arrested, Collins asked to speak with Chief Deputy Johnny Hall of the Lincoln County Sheriff's Office.[1] Collins told Hall that he walked up to a group of men "to get a smoke" and heard the men talking about robbing a bank. At first, Collins told Hall that he was just a "lookout" for the robbery, but later he changed his story and admitted that he was inside the bank during the robbery. By the end of the interview, Collins changed his story again and again claimed that he was just a "lookout."

¶8.     At trial, Collins testified that early in the morning on August 31, 2017, he was walking

---

[1] Hall was previously married to Collins's aunt.

3

near the Cloverdale Apartments when he saw a group of men in the parking lot. He bought marijuana from them and stayed to smoke with them. The men were talking about "hitting a lick." One of the men, Latrick Williams, wanted to rob a bank, and the others were "for it." Collins testified that he "wasn't for it, but [he] was around." According to Collins, Brookhaven Police Chief Kenny Collins had previously offered him $5,000 "to get [Williams] for him." Collins testified that he called Chief Collins and told him about Williams's plan to rob a bank. Collins testified that Chief Collins "told [him] to stay around," so he "smoked a couple more blunts" with the men. According to Collins, the other men began preparing for the robbery by getting guns and putting on ski masks. Collins testified that he did not help them but did not leave because he wanted to get the $5,000 that Chief Collins had offered him. Collins testified that he tried to call Chief Collins again but did not get an answer. Collins claimed that while he waited, he sat on the front porch of Calvin Craig's house and smoked a cigarette with Craig. Collins testified that he expected the police to arrive before the robbery occurred, "but [the police] didn't show." Collins claimed that he watched the robbery from Craig's front porch. Collins did not identify the robbers, and he claimed that he had no role in the robbery. Collins was arrested a short time later. He claimed that he had never seen the money and clothes that were on the ground near him when he was arrested and did not know how his DNA was on the T-shirt.

¶9. Collins claimed that Chief Collins came to visit him in the county jail after he was arrested. He claimed that Chief Collins wanted to know where Williams and the other men had gone. Collins testified that he never told Hall that he was inside the bank during the

4

robbery. He also testified that he was high when he talked to Hall.

¶10. Hall and Chief Collins testified in rebuttal. Hall testified that Collins never told him anything about working for Chief Collins and never mentioned Calvin Craig. Hall also testified that Collins did not appear to be under the influence when they talked.

¶11. Chief Collins testified that he did not talk to Collins prior to the bank robbery and did not receive any advance warning about the robbery. Chief Collins also testified that he never offered Collins money to turn in Williams. Chief Collins did talk to Collins after his arrest. Chief Collins testified that Collins admitted that he participated in the robbery and went inside the bank but only because Williams "forced" him to.

¶12. At the close of evidence, there was an off-the-record charge conference. The trial judge stated on the record that except for Collins's request for a peremptory instruction, the parties had agreed that all proffered instructions would be given. Neither side objected to any of the instructions. Indeed, both sides stated on the record that they were "in agreement that the instructions [were] proper and properly given."

¶13. The jury found Collins guilty of conspiracy to commit armed robbery and armed robbery. The court sentenced him to serve consecutive terms of five years and forty-three years in the custody of the Department of Corrections. Collins filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

## ANALYSIS

¶14. Collins raises one issue on appeal, arguing that the jury instruction describing the elements of armed robbery constituted an impermissible constructive amendment of the

indictment.  Collins acknowledges that he did not object to the instruction at trial, but he argues that it was "plain error."

¶15.    The armed robbery statute provides,

> Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery[.]

Miss. Code Ann. § 97-3-79 (Rev. 2014).  Thus, there are two general ways that an armed robbery can be committed under the statute: by actual "violence" to the victim's person or by putting the victim "in fear of immediate injury to his person by the exhibition of a deadly weapon." *Id.*

¶16.    Collins's indictment alleged that he committed armed robbery in the former manner, i.e., "by violence to the person[s] of . . . Green and . . . Frazier, with a deadly weapon: to-wit: a pistol."  In contrast, the jurors were instructed that they should find Collins guilty if they found beyond a reasonable doubt that he robbed the bank "by putting . . . Green and . . . Frazier in fear of immediate injury to their persons, by the exhibition of a deadly weapon, to wit: a handgun."  On appeal, Collins argues that the variance between the indictment and the jury instruction constituted a constructive amendment of the indictment.  As stated above, Collins concedes that he failed to raise this issue at trial.  Indeed, his trial attorney agreed on the record that the instruction was proper.

¶17.    "A constructive amendment of the indictment occurs when the proof and instructions broaden the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand

6

jury in its indictment." *Bell v. State*, 725 So. 2d 836, 855 (¶58) (Miss. 1998). However, our Supreme Court has "held that a defendant's 'failure to object to the jury instruction as constructively amending the indictment waives this issue on appeal.'" *Brent v. State*, 296 So. 3d 42, 50 (¶30) (Miss. 2020) (quoting *Neal v. State*, 15 So. 3d 388, 397 (¶13) (Miss. 2009)). "If no contemporaneous objection is made, the error, if any, is waived and [our] review is limited to plain error." *Id.* (quotation marks omitted). Our Supreme Court has "also explained that 'not all variances between the indictment and instructions constitute a constructive amendment, nor do they rise to plain error.'" *Id.* (brackets omitted) (quoting *Bell*, 725 So. 2d at 855 (¶61)).

¶18. In the present case, the jury instruction did constructively amend the indictment. The indictment alleged that the robbery was committed by actual "violence" to the victims' persons. In contrast, the jury was instructed to return a guilty verdict if it found beyond a reasonable doubt that Collins committed the robbery by putting the victims "in fear of immediate injury to their persons" by exhibiting a handgun. This variance permitted the trial jury to convict Collins on grounds different than those alleged by the grand jury in the indictment. *Bell*, 725 So. 2d at 855 (¶58). However, Collins's failure to object to the instruction waives the issue absent plain error. *Brent*, 296 So. 3d at 50 (¶30).

¶19. The Supreme Court has made clear that not all variances constitute "plain error." *Id.* As the Supreme Court has explained,

> We apply the plain-error rule only if a defendant's substantive or fundamental rights are affected. Applying the plain-error rule, the Court must determine: (1) whether the trial court deviated from a legal rule; (2) whether the error is plain, clear, or obvious; and (3) whether the error prejudiced the outcome of

7

the trial. Only if the error resulted in a manifest miscarriage of justice will reversal occur.

*Willie v. State*, 204 So. 3d 1268, 1279 (¶29) (Miss. 2016) (citations and quotation marks omitted).

¶20. Applying the plain-error doctrine, this Court has held that a variance is not "plain error" if it does not prejudice the defendant's defense at trial or deny his right to a fair trial. *See Faulkner v. State*, 109 So. 3d 142, 147 (¶18) (Miss. Ct. App. 2013); *Young v. State*, 271 So. 3d 650, 657 (¶28) (Miss. Ct. App. 2018), *cert. dismissed*, 272 So. 3d 132 (Miss. 2019); *Mendez v. State*, No. 2019-KA-00430-COA, 2020 WL 5089429, at *7 (¶37) (Miss. Ct. App. Aug. 18, 2020) (motion for rehearing pending). For example, in *Faulkner*, the defendant (Faulkner) argued that a jury instruction constructively amended his indictment because it permitted the jury to convict him of causing a minor to commit a sexual battery based on a different sex act than the act alleged in the indictment. *Faulkner*, 109 So. 3d at 146 (¶¶10-11). Faulkner conceded that he did not object to the instruction at trial but argued that the variance was plain error. *Id.* at (¶12). We held that there was no plain error because

> Faulkner's defense was not hampered by the [variance]. Faulkner's defense did not hinge on [any] insistence that he merely directed [a sex act] but not [the indicted sex act]. Rather, Faulkner wholly denied any involvement in sexual acts with the children. On these facts, we are unable to say any forfeited error in the jury instruction prejudiced Faulkner's defense or otherwise affected his substantial right to a fair trial. At most, the variance was a slight flaw in the trial that did not seriously affect the . . . fairness of the . . . proceeding.

*Id.* at 147 (¶18); *see also Mendez*, 2020 WL 5089429, at *7 (¶37) (holding that a variance between an indictment for sexual battery and a jury instruction was not "plain error" because the defendant's "trial strategy was to generally deny that he touched the [victim] in any

8

manner," not to deny the specific sex act alleged in the indictment).

¶21.    The same reasoning applies in this case.  Collins's defense "did not hinge on [any] insistence that he [committed the robbery but did not use actual violence]." *Faulkner*, 109 So. 3d at 147 (¶18).  "Rather, [Collins] wholly denied any involvement in [the robbery]." *Id.* As discussed above, Collins's defense was that he watched the robbery from Calvin Craig's porch at the request of Chief Collins.  "On these facts, we are unable to say any forfeited error in the jury instruction prejudiced [Collins's] defense or otherwise affected his substantial right to a fair trial.  At most, the variance was a slight flaw in the trial that did not seriously affect the . . . fairness of the . . . proceeding." *Id.*  Accordingly, we hold that the variance between the indictment and the jury instruction was not "plain error," and we affirm Collins's convictions and sentences.

¶22.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR.**